Jason J. Rose
Securities and Exchange Commission
801 Cherry Street, Suite 1900
Fort Worth, Texas 76102
(817) 978-1408
rosej@sec.gov

ATTORNEY FOR PLAINTIFF
SECURITIES AND EXCHANGE
COMMISSION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Civil Action No. |
| v. | |
| JUSTIN JENNINGS and VORTEX STRATEGIES LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC"), 801 Cherry Street, Suite 1900

Fort Worth, Texas 76102, files this Complaint against Defendants Justin Jennings ("Jennings"),

9000 Anna Circle, Unit 9412, Rockaway, New Jersey 07866, and Vortex Strategies LLC

("Vortex"), 1309 Coffeen Avenue, Suite 1200, Sheridan, Wyoming 82801, and alleges as

follows:

## SUMMARY

1. This case concerns Jennings's unlawful insider trading based upon material

nonpublic information in advance of eight significant corporate disclosures by public companies

(the "Corporate Disclosures"). From approximately February 2022 through October 2024,

Jennings misappropriated and illegally traded on material nonpublic information prior to each of

the Corporate Disclosures. Jennings misappropriated that inside information from his then-romantic partner, an account executive (the "Account Executive") who worked for a strategic communications and investor relations firm (the "Communications Firm") that provided services to public companies related to the Corporate Disclosures.

2. Jennings used the Account Executuve's work-issued laptop computer (the "laptop") to access material nonpublic information about the impending Corporate Disclosures that was stored on the Communication Firm's systems.

3. Jennings obtained information related to mergers and acquisitions, earnings announcements, and other significant corporate events involving several of the Communications Firm's public company clients. On the basis of that material nonpublic information, Jennings—in brokerage accounts belonging to himself and Vortex, a company that he owned and controlled—bought the common stock and stock options of US Ecology, Inc. ("US Ecology"), Tenneco Inc., ("Tenneco"), Infrastructure and Energy Alternatives, Inc. ("IEA"), Myovant Sciences Ltd. ("Myovant"), TravelCenters of America Inc. ("TravelCenters"), Discover Financial Services ("Discover"), Everi Holdings Inc. ("Everi"), and EVgo Inc. ("EVgo"). Through his insider trading, Jennings, personally and through Vortex, made illicit profits of approximately $2.7 million.

4. By engaging in the conduct alleged herein, Jennings and Vortex violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]. Accordingly, the SEC seeks permanent injunctions, disgorgement with prejudgment interest, and civil penalties against Jennings and Vortex.

## JURISDICTION AND VENUE

5.     The Court has jurisdiction over this action under Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa]. Jennings and Vortex, directly or indirectly, made use of means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange, in connection with the transactions, acts, practices, and courses of business alleged herein.

6.     Venue in this district is proper under Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain acts, practices, transactions, and courses of business constituting the violations alleged herein occurred within this district, and Jennings also resides in this district.

## DEFENDANTS

7.     **Jennings** is a resident of Rockaway, New Jersey.

8.     **Vortex** is a Wyoming limited liability company with its stated principal place of business in Sheridan, Wyoming. Jennings is the sole owner and control person of Vortex and is the only authorized trader for its brokerage account in which it made the securities transactions that are the subject of this complaint. Jennings frequently accessed Vortex's brokerage account while present in this district. At all relevant times, Jennings exercised complete control over Vortex.

## OTHER RELEVANT INDIVIDUAL AND ENTITIES

9.     **Account Executive** was, at all relevant times, employed by the Communications Firm as an account executive.

10.     **Communications Firm** is a strategic communications and investor relations firm headquartered in New York, New York.

11.     **US Ecology** was, at all relevant times, a Delaware corporation headquartered in Boise, Idaho, whose common stock was listed on Nasdaq under the symbol ECOL.

3

12.     **Tenneco** was, at all relevant times, a Delaware corporation headquartered in Lake Forest, Illinois, whose common stock was listed on the New York Stock Exchange under the symbol TEN.

13.     **IEA** was, at all relevant times, a Delaware corporation headquartered in Indianapolis, Indiana, whose common stock was listed on Nasdaq under the symbol IEA.

14.     **Myovant** was, at all relevant times, a Bermuda corporation headquartered in London, England, whose common stock was listed on the New York Stock Exchange under the symbol MYOV.

15.     **TravelCenters** was, at all relevant times, a Maryland corporation headquartered in Westlake, Ohio, whose common stock was listed on Nasdaq under the symbol TA.

16.     **Discover** was, at all relevant times, a Delaware corporation headquartered in Riverwoods, Illinois, whose common stock was listed on the New York Stock Exchange under the symbol DFS.

17.     **Everi** was, at all relevant times, a Delaware corporation headquartered in Las Vegas, Nevada, whose common stock was listed on the New York Stock Exchange under the symbol EVRI.

18.     **EVgo** was, at all relevant times, a Delaware corporation headquartered in Los Angeles, California, whose common stock was listed on Nasdaq under the symbol EVGO.

## COMMONLY USED TRADING TERMS

19.     A stock option, commonly referred to as an "option," gives its purchaser-holder the option to buy or sell shares of an underlying stock at a specified price (the "strike" price) prior to the expiration date. Options are generally sold in "contracts," which give the option holder the opportunity to buy or sell 100 shares of an underlying stock.

20.     A "call" option gives the purchaser-holder of the option the right, but not the obligation, to purchase a security at a specified strike price within a specific period of time ending on the expiration date. Generally, the buyer of a call option anticipates that the price of the underlying security will increase during that period of time.

21.     A "put" option gives the purchaser-holder of the option the right, but not the obligation, to sell a security at a specified strike price within a specific period of time ending on the expiration date. Generally, the buyer of a put option anticipates that the price of the underlying security will decrease during that period of time.

**FACTS**

**I.      Jennings Misappropriated Material Nonpublic Information from the Account Executive**

22.     After retiring as a professional soccer player in late 2021, Jennings worked for a property management company until late 2022. Jennings then worked as a freelance coder, and he eventually formed a data science coding company. Jennings had no experience in the securities industry.

23.     From approximately September 2021 until December 2024, Account Executive worked as an account executive at the Communications Firm. She was responsible for, among other things, drafting and editing press releases and other communications for the Communications Firm's clients.

24.     The Communications Firm provided the Account Executive with the laptop to perform her job duties. The laptop's user could access the Communications Firm's systems. One such system was a document management system or database that contained material nonpublic information about clients of the Communications Firm, including drafts of press releases, talking

5

points, strategy documents, and other communications prepared by employees of the Communications Firm (the "database").

25.     During the entire time that the Account Executive worked at the Communications Firm, she was in a committed romantic relationship with Jennings. During that period, Jennings and the Account Executive frequently stayed together at the Account Executive's apartment in New York City, as well as at Jennings's apartment in Rockaway, New Jersey. They also vacationed together and exchanged gifts on their birthdays and holidays.

26.     The Account Executive worked at the Communications Firm's office as well as from her apartment. When leaving the office, the Account Executive almost always took the laptop with her so that she could continue working from her apartment. She also brought the laptop with her when she stayed at Jennings's apartment. The Account Executive's typical practice when working from her apartment, or from Jennings's apartment, was to leave the laptop unlocked when she stopped working and stepped away from it, whether to go into another room or to leave the apartment. When the laptop was unlocked, no additional password was needed to access the database.

27.     The Account Executive used the laptop for personal use, in addition to using it for work. Due to the close personal nature of their relationship, the Account Executive regularly allowed Jennings to use the laptop for his personal use when she was present. The Account Executive also trusted Jennings to be alone with the laptop while she was away and it was unlocked. Additionally, because the Account Executive believed that Jennings would not misuse the laptop, she provided Jennings with the password to access the laptop when he asked for it. The Account Executive also showed Jennings the functionality of the database because Jennings told her that he was working on coding and database projects and because the Account Executive believed that Jennings was expressing legitimate interest in her work. The Account Executive

6

demonstrated to Jennings how she searched the database and how she used its filters to perform her work.

28.    From February 2022 through October 2024, Jennings profitably traded ahead of eight Corporate Disclosures involving the Communications Firm's clients. Initially, Jennings used his personal brokerage account to place these trades. In March 2022, Jennings formed Vortex and opened a brokerage account held in the company's name. In September 2022, Jennings began using Vortex and the Vortex account to trade ahead of the Corporate Disclosures.

29.    Jennings repeatedly used the laptop to access database files related to the Corporate Disclosures shortly before Jennings purchased securities whose prices would be affected by the Corporate Disclosures. The files accessed by the laptop contained material nonpublic information. Many of the documents were labeled as confidential drafts that were not for immediate release. Others withheld information, such as the identity of the parties to the transaction or the purchase price of the acquisition. Additionally, some of the documents used a code name for the transaction to maintain confidentiality. However, even in these instances, the documents contained sufficient information for Jennings to discern the parties' identities.

30.    The Account Executive did not work on any of the Corporate Disclosures, she did not use the laptop to access the documents related to the Corporate Disclosures, and she did not trade securities in advance of the Corporate Disclosures. Moreover, the Account Executive did not provide Jennings with any information regarding the Corporate Disclosures, and she did not authorize Jennings to use the laptop to access the confidential information contained in the database.

31.    Jennings had access to the laptop that accessed the documents related to the Corporate Disclosures, and he traded in advance of the Corporate Disclosures. Significantly, Jennings's iCloud account also contained a screenshot of a draft press release concerning an

7

additional corporate disclosure by a Communications Firm client, which the laptop had previously accessed on the database. Jennings did not trade ahead of that draft press release.

## II.    Jennings's Traded Ahead of the Corporate Disclosures

### A.    US Ecology

32.    US Ecology retained the Communications Firm in connection with Republic Services, Inc.'s ("Republic") acquisition of US Ecology, which was publicly announced prior to market opening on February 9, 2022. On February 6, 2022, Jennings used the laptop to access several documents contained in the database relating to the acquisition, including a draft press release and a draft letter from US Ecology's CEO to the company's employees explaining the transaction. The documents related to the transaction, which was given the code name "Project Bronco" to protect its confidentiality, were drafted to minimize identifying information regarding the parties to the deal. Nevertheless, they provided enough information to reveal that Republic was about to acquire US Ecology. On the morning of February 7, 2022, Jennings used the laptop to access additional database documents and notes contained in the database regarding the acquisition.

33.    Later on February 7, 2022, Jennings used his personal brokerage account to purchase US Ecology call options at a total cost of approximately $4,800.

34.    On February 9, 2022, in response to the acquisition announcement, US Ecology's share price increased 67.7%. That same day, Jennings sold all of his US Ecology call options for realized profits of approximately $27,600.

### B.    Tenneco

35.    Tenneco retained the Communications Firm in connection with Apollo Global Management, Inc.'s ("Apollo") acquisition of Tenneco, which was publicly announced prior to market opening on February 23, 2022. On February 6, 2022, Jennings used the laptop to access a

confidential draft press release concerning the acquisition, which was contained in the database. On February 16, 2022, Jennings used the laptop to access an updated version of the draft press release contained in the database.

36.     Between February 14, 2022 and February 17, 2022, Jennings used his personal brokerage account to purchase Tenneco call options at a total cost of approximately $11,100.

37.     On February 23, 2022, in response to the acquisition announcement, Tenneco's share price increased 93.9%. That same day, Jennings sold all of his Tenneco call options for realized profits of approximately $65,800.

### C.     IEA

38.     IEA retained the Communications Firm in connection with MasTec, Inc.'s ("MasTec") acquisition of IEA, which was publicly announced prior to market opening on July 25, 2022. On July 8, 2022 and July 9, 2022, Jennings used the laptop to access documents contained in the database concerning the acquisition, including a confidential draft press release.

39.     Between July 12, 2022 and July 21, 2022, Jennings used his personal brokerage account to purchase IEA call options at a total cost of approximately $9,200.

40.     On July 25, 2022, in response to the acquisition announcement, IEA's share price increased 31.8%. That same day and the following day, Jennings sold all of his IEA call options for realized profits of approximately $37,200.

### D.     Myovant

41.     Sumitovant Biopharma Ltd. ("Sumitovant") retained the Communications Firm in connection with Sumitovant's acquisition of Myovant, which was publicly announced after market close on October 2, 2022. On September 17, 2022, Jennings used the laptop to access documents contained in the database concerning the acquisition, including a confidential draft

9

press release. Jennings continued to use the laptop to access documents contained in the database concerning the transaction on the morning of September 20, 2022.

42.     On September 20, 2022, Jennings used Vortex's brokerage account to purchase Myovant call options at a total cost of approximately $5,900. On September 27, 2022, after Jennings used the laptop to access a more recent version of the draft press release contained in the database, Jennings used Vortex's brokerage account to purchase additional Myovant call options at a total cost of $1,700.

43.     On October 3, 2022, in response to the acquisition announcement, Myovant's share price increased 36.1%. Later that same day, Jennings sold all of Vortex's Myovant call options for realized profits of approximately $27,300.

**E.     TravelCenters**

44.     A significant shareholder of TravelCenters retained the Communications Firm in connection with the acquisition of TravelCenters by BP p.l.c. ("BP"), which was publicly announced prior to market opening on February 16, 2023. On February 11, 2023, Jennings used the laptop to access several documents contained in the database related to the acquisition, some of which contained information concerning the transaction's timing and price. During the next two days, Jennings continued using the laptop to access draft social media posts announcing the acquisition, which were contained in the database.

45.     On February 13, 2023, Jennings used Vortex's brokerage account to purchase TravelCenters call options at a total cost of approximately $8,000. That same day, Jennings used Vortex's brokerage account to purchase TravelCenters common stock at a total cost of approximately $900. On February 14, 2023 and February 15, 2023, Jennings continued using the laptop to access documents contained in the database concerning the acquisition. On February

10

15, 2023, Jennings used Vortex's brokerage account to purchase additional TravelCenters call options at a total cost of approximately $2,000.

46.    On February 16, 2023, in response to the acquisition announcement, TravelCenters's share price increased 70.8%. That same day, Jennings sold all of Vortex's TravelCenters call options for realized profits of approximately $858,500. On February 24, 2023, Jennings sold all of Vortex's TravelCenters common stock for realized profits of approximately $700.

### F.    Discover

47.    Discover retained the Communications Firm in connection with, among other things, Discover's impending disclosure of a $365 million liability related to the misclassification of certain consumer cards, which Discover publicly announced after market close on July 19, 2023. On July 17, 2023, Jennings used the laptop to access a confidential draft media statement regarding the misclassification, which was contained in the database.

48.    On July 17, 2023 and July 18, 2023, Jennings used Vortex's brokerage account to purchase Discover put options at a total cost of approximately $106,100.

49.    On July 20, 2023, in response to the $365 million liability announcement, Discover's share price decreased 15.9%. That same day, Jennings sold all of Vortex's Discover put options for realized profits of approximately $983,600.

### G.    Everi

50.    Apollo retained the Communications Firm in connection with Apollo's acquisition of Everi, which was publicly announced prior to market opening on July 26, 2024. On July 20, 2024, Jennings used the laptop to access a confidential draft press release concerning the acquisition, which was contained in the database.

11

51.     On July 22, 2024 and July 23, 2024, Jennings used Vortex's brokerage account to purchase Everi call options at a total cost of approximately $42,600.

52.     On July 26, 2024, in response to the acquisition announcement, Everi's share price increased 40.3%. Between July 26, 2024 and July 30, 2024, Jennings sold all of Vortex's Everi call options for realized profits of approximately $376,300.

**H.     EVgo**

53.     EVgo retained the Communications Firm in connection with EVgo's impending disclosure that it had been selected by the U.S. Department of Energy to receive up to a $1.25 billion loan guarantee, which EVgo publicly announced prior to market opening on October 3, 2024. On September 25, 2024, Jennings used the laptop to access a confidential draft press release concerning the loan guarantee, which was contained in the database.

54.     That same day, Jennings used Vortex's brokerage account to purchase EVgo common stock at a total cost of approximately $6,100. Between September 26, 2024 and October 1, 2024, Jennings used Vortex's brokerage account to purchase EVgo call options at a total cost of approximately $86,600.

55.     On October 3, 2024, in response to the loan guarantee announcement, EVgo's share price increased 60.8%. Between October 3, 2024 and October 8, 2024, Jennings sold all of Vortex's EVgo call options for realized profits of approximately $351,800.

56.     In all, Jennings, personally and through Vortex, realized profits of approximately $2.7 million from trading ahead of the eight Corporate Disclosures.

**III.     Jennings and Vortex Violated the Federal Securities Laws**

57.     The Communications Firm's information that Jennings accessed concerning the Corporate Disclosures was material and nonpublic. A reasonable investor would have viewed the

information as important to his or her investment decision and as significantly altering the total mix of information available to the public regarding the affected securities.

58. Jennings owed a duty of trust or confidence to the Account Executive by virtue of their close personal relationship, and knew, or was reckless in not knowing, that he owed such a duty. Jennings also knew, or was reckless in not knowing, that the Account Executive expected, based on their history, pattern, and practice of sharing confidences, that Jennings would not use the laptop to access confidential information related to her work and that Jennings would not trade on any such information for his personal benefit.

59. Jennings used his personal brokerage account to purchase US Ecology, Tenneco, and IEA securities while aware of and on the basis of material nonpublic information concerning these companies, including the upcoming Corporate Disclosures related to these companies, and in breach of his duty of trust or confidence to the Account Executive.

60. Jennings used Vortex's brokerage account to purchase Myovant, TravelCenters, Discover, Everi, and EVgo securities while aware of and on the basis of material nonpublic information concerning these companies, including the upcoming Corporate Disclosures related to these companies, and in breach of his duty of trust or confidence to the Account Executive.

## CLAIM FOR RELIEF

### Jennings and Vortex Violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]

61. The SEC realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 60 above.

62. By engaging in the acts and conduct alleged herein, Jennings and Vortex, directly or indirectly, in connection with the purchase or sale of a security, by the use of any means or

instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, knowingly or with severe recklessness:

(a)     employed a device, scheme, or artifice to defraud; and

(b)     made an untrue statement of material fact, or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c)     engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

63.     By reason of the foregoing, Jennings and Vortex violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

THEREFORE, the SEC respectfully requests that the Court enter a Final Judgment that:

A.     Permanently enjoins Jennings and Vortex from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5];

B.     Orders Jennings and Vortex to disgorge all ill-gotten gains received as a result of the violations alleged herein, plus prejudgment interest on those amounts, pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)];

C.     Orders Jennings and Vortex to pay civil penalties under Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

D.     Grants such further relief as the Court deems just and proper.

14

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC demands a trial by jury on all issues that may be so tried.

Date: June 23, 2026                    Respectfully submitted,

                                       *s/ Jason J. Rose*
                                       Jason J. Rose
                                       Securities and Exchange Commission
                                       801 Cherry Street, Suite 1900
                                       Fort Worth, Texas 76102
                                       (817) 978-1408
                                       rosej@sec.gov

                                       ATTORNEY FOR PLAINTIFF
                                       SECURITIES AND EXCHANGE
                                       COMMISSION

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Civil Action No. |
| v. | |
| JUSTIN JENNINGS and VORTEX STRATEGIES LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, I certify that the matter in controversy alleged against the Defendants in the foregoing complaint is not the subject of any other civil action pending in any court, or of any pending arbitration or administrative proceeding.

Date: June 23, 2026

Respectfully submitted,

*s/ Jason J. Rose*
Jason J. Rose
Securities and Exchange Commission
801 Cherry Street, Suite 1900
Fort Worth, Texas 76102
(817) 978-1408
rosej@sec.gov

ATTORNEY FOR PLAINTIFF
SECURITIES AND EXCHANGE
COMMISSION

16

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Civil Action No. |
| v. | |
| JUSTIN JENNINGS and VORTEX STRATEGIES LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

**DESIGNATION OF AGENT FOR SERVICE**

Pursuant to Local Civil Rule 101.1(f), because the Securities and Exchange Commission ("SEC") does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as eligible as an alternative to the SEC to receive service of all notices or papers in this action. Therefore, service upon the United States Attorney or his authorized designee, David Dauenheimer, Deputy Chief, Civil Division, United States Attorney's Office for the District of New Jersey, 970 Broad Street, 7th Floor, Newark, NJ 07102, shall constitute service upon the SEC for purposes of this action.

Date: June 23, 2026

Respectfully submitted,

*s/ Jason J. Rose*
Jason J. Rose
Securities and Exchange Commission
801 Cherry Street, Suite 1900
Fort Worth, Texas 76102
(817) 978-1408
rosej@sec.gov

ATTORNEY FOR PLAINTIFF
SECURITIES AND EXCHANGE
COMMISSION

17